[Cite as *In re L.R.B.*, 2020-Ohio-6642.]

# IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## MONTGOMERY COUNTY

| | |
|---|---|
| IN RE: L.R.B, N.J.B. and J.B.B. | : |
| | : |
| | :     Appellate Case No. 28826 |
| | : |
| | :     Trial Court Case Nos. 2016-1686, |
| | :     2016-1687, 2018-0065 |
| | : |
| | :     (Appeal from Common Pleas Court- |
| | :     Juvenile Division) |
| | : |

. . . . . . . . . . .

# O P I N I O N

Rendered on the 11th day of December, 2020.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by JAMIE J. RIZZO, Atty. Reg. No. 0099218, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
       Attorney for Appellee, Montgomery County Children Services

KAREN S. MILLER, Atty. Reg. No. 0071853, P.O. Box 341274, Beavercreek, Ohio 45434
       Attorney for Appellant, Mother

. . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Appellant Mother appeals from a juvenile court judgment awarding permanent custody of her minor children, N.J.B., L.R.B, and J.B.B., to Montgomery County Children Services ("MCCS"). The children's father has not appealed.

{¶ 2} In support of her appeal, Mother asserts that MCCS failed to prove by clear and convincing evidence that an award of permanent custody was in the children's best interest.   For the reasons discussed below, we conclude that the trial court did not abuse its discretion by finding that a grant of permanent custody to MCCS was in the children's best interest. The court's findings were supported by competent, credible evidence, and there was clear and convincing evidence that granting permanent custody to MCCS was in the children's best interest.   Accordingly, the judgment of the trial court will be affirmed.

## I.   Facts and Course of Proceedings

{¶ 3} The history of this case began with events that occurred in 2011, when a child of Mother, D.T., who had tested positive at birth for drugs not prescribed to Mother, died under suspicious circumstances.   See Montgomery J.C. No. 2016-1687, March 16, 2016 Dependency Complaint, p, 1.[1]   D.T. was admitted to Dayton Children's Hospital ("DCH") when he was seven weeks old, with injuries consistent with physical abuse.   Id.; Transcript of Proceedings (March 18, 2019 Permanent Custody Hearing) ("Tr."), p. 28.

{¶ 4} Dr. Lori Vavul-Roediger, an expert in pediatric child abuse, treated D.T. during his hospitalization.   Id. at p. 12, 28, and 48.   Dr. Roediger found that D.T. had acute subdural hemorrhages and bilateral, multilayered retinal hemorrhages in both eyes.

---

[1] Because there are three cases, there are pleadings for each child.   However, the pertinent records are identical.   As a result, we will refer to the docket and pleadings in N.J.B.'s case (Montgomery J.C. No. 2016-1687) unless otherwise indicated.

Her diagnosis was that D.T. had been physically abused, as his injuries were consistent with head trauma. *Id.* at p. 48-49. Unfortunately, D.T. became septic during his hospitalization and died. *Id.* at p. 28 and 49. Although Mother had no explanation for the child's injuries, no criminal charges were filed. However, abuse was suspected. Dependency Complaint at p.1.

{¶ 5} In March 2016, Mother appeared again at DCH with another child, L.R.B., who was four weeks old. Tr. at p. 13 and 15. Dr. Roediger again was asked to consult, based on concerns over possible head trauma due to physical abuse. *Id.* at p. 14. According to the records, L.R.B. had tested positive for opiates at birth, had not been seen by a doctor since birth, and was not current on any immunizations. *Id.* at p. 172 and May 11, 2016 Guardian Ad Litem ("GAL") Report, p. 3.

{¶ 6} When L.R.B. was brought to the hospital, medical personnel observed that bruising on her forehead and head and large areas of bruising on her buttocks were covered in a foundation or makeup-type product. Tr. at p. 52-53. Mother initially denied putting makeup on the bruises, but later admitted to a caseworker that she had done it because of what had happened with D.T. May 11, 2016 GAL Report at p. 3; Tr. at p. 170, 175; Dependency Complaint at p. 1.

{¶ 7} On examining L.R.B., Dr. Roediger noted acute intracranial hemorrhages and areas of ischemic (lack of blood flow) injury to L.R.B's brain. It was also noted on admission and on the doctor's exam that L.R.B. had a very large area of extensive bruising on her buttock and lower lateral thorax as well as on the side of her head. Tr. at p. 17. Dr. Roediger concluded that L.R.B. had been physically maltreated and that the injuries were inflicted, or nonaccidental, trauma. *Id.* Specifically, an extensive

medical evaluation indicated no type of genetic abnormality or blood disorder that would have led to the injuries. *Id.* at p. 17-18. Mother also had no explanation for the child's injuries, and denied any injuries, accidents, or falls. *Id.* at p. 54 and 169. Dr. Roediger stressed that a child of L.R.B.'s age (four weeks) could not possibly have inflicted these injuries on herself. *Id.* at p. 32.

{¶ 8} At the time Mother brought L.R.B. to the hospital, Mother, L.R.B., and N.J.B. (born in December 2013) lived in a home with the maternal grandparents. *Id.* at p. 170; Dependency Complaint at p. 1. Mother was the primary caregiver, but she stated that the grandfather was the last one to change L.R.B.'s diaper before she was brought to the hospital. MCCS later substantiated abuse concerning both Mother and the grandfather. *Id.* at p. 170-171.

{¶ 9} L.R.B. was hospitalized for about a week for her trauma. *Id.* at p. 59. A few days after the hospital admission, MCCS filed dependency complaints regarding L.R.B. and N.J.B., as well as motions and affidavits for interim temporary custody at an ex parte hearing. *E.g.* Dependency Complaints. The complaints alleged that the children lacked proper parental care due to the mental or physical condition of their parents and that the children's condition or environment warranted assumption of their guardianship by the State. *Id.* at p. 1.

{¶ 10} The trial court granted temporary custody to MCCS on March 22, 2016, and the matter was set for an adjudicatory and dispositional hearing on May 11, 2016. Following the May hearing, the court filed an order on May 16, 2016, finding the children dependent and granting MCCS temporary custody until March 16, 2017, unless MCCS filed a motion before that date. Magistrate's Decision and Judge's Order, p. 2. The

court also approved the initial case plan MCCS had filed and granted Mother supervised visitation. *Id.*

{¶ 11} The initial case plan contained the following requirements: Mother was to identify a "sober responsible adult to supervise her children to reduce any chances of abuse and neglect"; complete parenting/psychological, drug/alcohol, and mental health assessments and follow any recommendations, which "may include individual/group counseling and random drug testing"; secure employment and maintain housing; and sign releases. Case Plan, p. 5. Father was not involved to a great degree at the time the case plan was implemented, but the plan stated he would be given goals once he became involved. *Id.* Mother was also given visitation with the children for two hours no less than two times per week. *Id.* at p. 6.

{¶ 12} In January 2017, MCCS filed a motion and affidavit for a first extension of temporary custody, noting that Mother had made some progress on the case plan. Mother was employed, had recently obtained housing, and had been released from substance abuse treatment. *See* Motion for Extension of Temporary Custody, p. 2. The trial court granted the first extension on February 1, 2017, and ordered that Father be added to the plan because he had recently established paternity. Magistrate's Interim and Final Order, p. 2. In addition, the court set a dispositional hearing for April 3, 2017. *Id.* at p. 3. After Father was added to the plan, his goals included completing a drug/alcohol assessment, following recommendations of the assessment, securing housing and income, maintaining contact with MCCS, and signing releases. Amended Case Plan, p. 4.

{¶ 13} In March 2017, the GAL noted that no objective testing had been done

concerning Mother's mental health status or needs and no mental health counseling had occurred. At the GAL's request, MCCS scheduled a parenting/psychological assessment for Mother on May 2, 2017 with Dr. Lilley. GAL Report, p. 2, and May 13, 2017 Semi-Annual Review ("SAR"), p. 3. This goal was added to Mother's case plan in April 2017. Amended Case Plan, p. 1.

{¶ 14} In July 2017, MCCS moved for a second extension of temporary custody, and it was approved on August 2, 2017. In September 2017, a SAR indicated that Mother had been employed full-time since the beginning of 2017, had begun having two-hour in-home visits on Fridays with N.J.B. and L.R.B., and had completed a psychological evaluation. However, MCCS was still awaiting results of the evaluation. SAR, p. 7.

{¶ 15} In November 2017, the GAL filed a report noting that "Dr. Lilley diagnosed mother with adjustment disorder with depressed mood; opioid-related disorder by history; and R/O personality disorder with dependency and narcissistic features." November 16, 2017 GAL report, p. 4-5. The doctor's report further found that Mother " 'has a limited frustration tolerance and she can respond impulsively particularly during times of stress. Her egocentrism leads to focus on meeting her own needs before those of others. *She tended to endorse parenting approaches that were rigid and restrictive, which can result in disciplinary practices that are overly harsh and punitive*.' " (Emphasis sic.) *Id*. at p. 5, quoting Dr. Lilley's report. The GAL was particularly concerned by this latter finding, due to the history of the case. *Id*.

{¶ 16} Dr. Lilley recommended gradual increases in Mother's parenting time prior to reunification and noted that Mother needed a structured care plan for the children when she was at work. *Id.* In addition, the GAL noted that: "Dr. Lilley recommended

counseling for mother focused on parenting; and parenting classes focused on children in the pre-school period and those with oppositional behaviors. Finally, mother is encouraged to establish a relationship with a therapist with expertise in opioid use disorder, due to the anticipated stresses and challenges mother will experience in parenting young children combined with N.[J.]B.'s oppositional tendencies." *Id.*

{¶ 17} In the report, the GAL also said, "Due to the history of two of mother's children experiencing unexplained accidental head trauma with subdural hematomas, I have serious concerns for the long-term safety of these children if reunited, despite Dr. Lilley's findings and mother's efforts regarding the case plan." *Id.* at p. 6.

{¶ 18} Following a dispositional hearing on November 7, 2017, the court filed an order granting a second extension of temporary custody. In the order, the court observed that Mother had made significant progress on other objectives in her case plan, but had not completed the recommendations in Dr. Lilley's report. The court then set an annual review hearing for February 21, 2018. Magistrate's Decision and Judge's Order, p. 2.

{¶ 19} On November 21, 2017, Mother gave birth to J.B.B., but she concealed the birth from MCCS. After receiving information about the birth on December 15, 2017, MCCS spoke to Mother to determine whether she, in fact, had a new baby. At that point, Mother denied both being pregnant and giving birth to a child. After MCCS called Mother again on December 18, 2017, Mother admitted that she had given birth. MCCS was then able to visit the next day and see the child. Montgomery J.C. No. 2018-0065, Dependency Complaint, p. 1. On January 1, 2018, MCCS filed a dependency complaint concerning J.B.B. *Id.*

**{¶ 20}** Despite having initially concealed J.B.B.'s birth, Mother began cooperating with MCCS.   In February 2018, MCCS filed a motion and affidavit asking the court to give legal custody of all three children to Mother, with protective supervision to MCCS, because Mother was complying with her case plan objectives.   *See* Montgomery J.C. No. 2016-1687, MCCS Motion for Legal Custody to Mother, p. 2.    Although Mother had not yet completed her case plan objectives, MCCS was concerned about the fact that shuffling the children between their foster home and Mother was detrimental and was causing behavioral concerns, especially for N.J.B.   Tr. at p. 156-157 and 194.   That factor pushed MCCS to move forward with returning custody to Mother.   *Id.* at p. 157.

**{¶ 21}** On February 21, 2018, the trial court granted Mother temporary custody, with interim protective services being given to MCCS.   *See* Magistrate's Interim Order and Decision, p. 4.   Additionally, the court granted Father visitation, with Mother or a person chosen by Mother to monitor the visit.   *Id.* at p. 3.   The court also set a dispositional hearing for April 27, 2018.   *Id.* at p. 5.

**{¶ 22}** In March 2018, the case was transferred to a new caseworker, Robert Brun. Tr. at p. 81.   At the time, an important objective was to have full-time protective daycare approved by the time the children were reunited with Mother in February 2018.   This was significant and was on the case plan because N.J.B.'s behavior needed to be treated. MCCS also wanted Mother to have a break from N.J.B.'s behavior and to have the children in a routine and a structured environment while she worked.   *Id.* at p. 98 and 193.   Before the case was transferred to Brun, the prior caseworker called the Job Center and verified that everything was in place for Mother to use the protective daycare.   *Id.* at p. 190 and 193.   All Mother needed to do was to select the daycare she wanted to use.

*Id.* at 190.

{¶ 23} Another goal was for N.J.B. to continue in counseling, but that did not occur. *Id.* at p. 99. Mother also failed to follow through with Addiction Services, despite several attempts by that agency to contact Mother before April 2017. *Id.* at p.135 and 140.

{¶ 24} After the hearing on April 27, 2018, the trial court granted legal custody of N.J.B. and L.R.B. to Mother and ordered that legal custody of J.B.B. remain with her. Magistrate's Decision and Judge's Order, p. 2. The court noted that Mother had made significant progress and that Father had not. *Id.* MCCS was awarded protective supervision for 12 months. *Id.* at p. 3. The court stressed, however, that:

> **Historically, one young child died under suspicious circumstances and one other young child sustained significant injuries while in the custody of the mother. The Court finds it necessary that the mother comply with the orders in this case to ensure the safety of the children. The mother has made significant progress in this case and the Court wants to ensure that the mother has services in place to assist the mother to maintain the children in her home**.

(Emphasis sic.) *Id.*

{¶ 25} Due to these concerns, the court specifically stated in the order granting Mother legal custody that Mother must do three things within 30 days: (1) put counseling in place for N.J.B.; (2) comply with Addiction Services or a like program for an assessment and follow all recommendations; and (3) complete the process of obtaining protective day care for the children. Magistrate's Decision and Judge's Order at p. 3. The court further

said that if Mother failed to comply within 30 days, MCCS was to remove the children and make a filing with the court concerning the removal or request for removal. *Id.*

{¶ 26} Although Mother had the children in her custody from February 2018 through most of July 2018, she did not accomplish the three items the court ordered. Tr. at p. 99, 128, 149. Consequently, MCCS filed a motion and affidavit with the court on July 24, 2018, asking for temporary custody with an interim order. *See* July 24, 2018 Motion and Affidavit for Temporary Custody. MCCS asked for an interim order to protect the children's safety and because Mother had failed to comply with court orders. In addition to Mother's failure to comply, the affidavit also noted that the maternal grandparents, who lived with Mother, had been involved in a domestic violence incident for which the police had been called to the home. *Id.* at p. 3.

{¶ 27} The next day, on July 25, 2018, MCCS filed another motion asking for ex parte temporary custody. This was because the maternal grandmother had been charged with petty theft, possession of drugs, and possession of criminal tools. In addition, the maternal grandfather had been charged with possession of criminal tools and petty theft. July 25, 2018 Motion and Affidavit for Interim Temporary Custody at an Ex Parte Hearing, p. 3.

{¶ 28} After the trial court granted the ex parte motion on July 25, 2018, MCCS removed the children that day and took them to the home of their prior foster parents. That evening, when the foster mother gave L.R.B. a bath, she noticed multiple bruises. *See* September 5, 2018 GAL Report, p. 1; Tr. at p. 221. L.R.B. told the foster mother that "mommy kicked me in the bed," but N.J.B. "spontaneously claimed 'no, she didn't, she kicked you in the bathtub.'" GAL Report at p. 5. The next day, the foster mother

contacted the MCCS nurse and notified Mother's caseworker about the bruises. Tr. at p. 221. On July 27, 2018, the foster mother took L.R.B. to the foster care clinic. *Id.*

{¶ 29} Dr. Roediger once again examined L.R.B., on July 27, 2018. The exam took place at DCH's foster and kinship program, which functions as a primary care office for children who are in foster or kinship care. Tr. at p. 19. During her examination, Dr. Roediger found the following injuries to L.R.B.: multiple areas of skin trauma, including pattern bruises that were grab marks on L.R.B.'s face, thighs, and lower ankles; a very large, healing laceration on the forehead; large overlapping bruises on the upper hip and lateral buttock; a bruise on the right inner calf; a bite mark on the right arm; a half-centimeter circular brown bruise on the top of the left foot; a .2 centimeter, fading brown/violaceous bruise in the nail bed of the right middle finger; a large purple bruise at the base of the nail bed on the right great toenail; and bruising to a few other toenails. Tr. at p. 21-23 and 33. Dr. Roediger stated that, while it is fairly normal for toddlers to have bruises, "[L.R.B.] had an extensive number of bruises on various body surfaces, especially areas that aren't typical for active, busy toddlers." *Id.* at p. 23.

{¶ 30} Based on her prior clinical experience with L.R.B., Dr. Roediger knew the child had no underlying bleeding disorder. *Id.* She also knew from the foster mother, who had cared for L.R.B. from March 2016 until early 2018, that there were no concerns about L.R.B. having extensive bruising while in her care. *Id.* at p. 23-24. Furthermore, during the examination, when the doctor pointed to the large indentation on the child's head and asked how she got it, L.R.B. said, "Mommy hurt me." *Id.* at p. 24. When Dr. Roediger also pointed to L.R.B.'s finger, where she had unusual bruising over the lower portion of her nail bed, and asked what had happened to her finger, L.R.B. again said,

"Mommy hurt me." *Id.* Although the doctor attempted to ask L.R.B. about her other injuries, L.R.B. "became distracted, got on the floor, and started playing with another child who was present." *Id.* at p. 24-25. In view of her clinical findings, Dr. Roediger diagnosed suspected child abuse. *Id.* at p. 25.

{¶ 31} Dr. Roediger continued to care for L.R.B. after she was removed from Mother's home, and noticed a difference in L.R.B. both emotionally and physically. *Id.* at p. 26. After L.R.B. was removed, she did not have any areas of extensive bruising and there were no concerns about atypical injuries, even though L.R.B. clearly was an active, busy toddler. *Id.*

{¶ 32} Dr. Roediger further stated that:

> [L.R.B.] has shown a dramatic, unbelievable improvement in her behavioral and emotional state. The little girl, * * * when I saw her two days after she was removed in July of 2018 was very anxious, very phobic, repeatedly asking to utilize the bathroom for fear she would wet her pants and be in trouble or be hurt. She must have left the room multiple times asking repeatedly to go potty, very afraid that she would wet her Pullup, just exorbitantly fearful.

Tr. at p. 27.

{¶ 33} On July 25, 2018, the day the court granted MCCS's ex parte custody, the court also set a shelter care hearing for July 26, 2018. Judge's Order, p. 1. Following the shelter care hearing, the court granted MCCS temporary custody, noting that Mother had not complied with court orders because she had failed to engage N.J.B. in counseling services, failed to actively participate in Addiction Services, and failed to take the children

to protective daycare.   The court also noted that Mother refused to submit to a random drug screen when requested and that criminal activity by the grandparents had occurred. Magistrate's Interim Order, p. 2.   A dispositional hearing was set for September 10, 2018. *Id.* at p. 3.

**{¶ 34}** Before the dispositional hearing occurred, the GAL filed a report, which included a discussion of the physical abuse of L.R.B. and recommended that temporary custody be given to MCCS.   *See* September 5, 2018 GAL Report.   At the dispositional hearing, the court granted MCCS temporary custody until July 25, 2019, unless MCCS filed a motion before that date.   The court further stated that Mother was not to have any contact with the children except through supervised visitation.   September 10, 2018 Magistate's Decision and Judge's Order, p. 2.   MCCS then filed a motion and affidavit for permanent custody on November 16, 2018.

**{¶ 35}** Due to L.R.B's hysterical reactions at the prospect of visiting Mother, visitation with Mother did not take place after September 24, 2018.   MCCS also filed to terminate Mother's visitation.   *See* March 14, 2019 GAL Report, p. 3.   In December 2018, the parties agreed to continue the motion to suspend Mother's parenting time and all other motions until the dispositional hearing on permanent custody, which was set for March 18, 2019.   *See* December 12, 2018 Magistrate's Interim Order.

**{¶ 36}** On March 14, 2019, the GAL filed a report recommending that the court grant permanent custody to MCCS.   *See* GAL Report.   Mother then filed a motion on March 15, 2019, asking the court to award her legal custody.   A few days later, the trial court held the permanent custody hearing as scheduled.

**{¶ 37}** At the hearing, MCCS presented testimony from these individuals: (1) Dr.

Roediger, who testified about the abuse to L.R.B.; (2) a therapist who had worked with both N.J.B. and L.R.B. to address behavioral issues; (3) the current MCCS caseworker for the family; (4) an MCCS transportation driver who testified about L.R.B.'s behavior when faced with being transported to visits; (5) a foster parent of the children; (6) an MCCS caseworker assigned to investigate the 2016 abuse of L.R.B.; (7) another MCCS caseworker assigned to investigate the 2018 abuse of L.R.B.; and (8) an MCCS caseworker assigned to the case between mid-August 2017 and March 2018. Mother presented her own testimony and that of the maternal grandparents. Father did not appear for the hearing.

{¶ 38} After all the evidence had been presented, the GAL told the court that his opinion as to permanent custody was unchanged. Tr. at p. 260-261. Subsequently, on April 15, 2019, the magistrate filed a decision awarding permanent custody to MCCS, denying Mother's motion for legal custody, and suspending Mother's visitation with L.R.B. Montgomery J.C. No. 2018-0065, April 15, 2019 Magistrate's Decision and Judge's Order, p. 9.[2] Mother then filed objections to the magistrate's decision on April 23, 2019.

{¶ 39} In June 2019, MCCS filed a motion to suspend the parents' visitation with N.J.B. and J.B.B. due to Mother's aggressive behavior toward MCCS staff (which had to call the police into visitation on more than one occasion), Mother's threats to the caseworker, which caused him to file a police report, Mother's inappropriate remarks to the children about returning home and not having to listen to others, and the detrimental effect of visitation on the children. Father was also visiting only sporadically and did not try to correct Mother's behavior when he was there. Montgomery J.C. No. 2016-1687,

---

[2] A copy of this decision was not in N.J.B.'s file.

June 17, 2019 Motion and Affidavit to Suspend Mother and Father's Visitation, p. 3.

{¶ 40} In July 2019, the GAL filed a report again recommending that permanent custody be granted to MCCS. In addition, the GAL recommended that the motion to suspend visitation should be granted pending a ruling on the permanent custody objections. July 8, 2019 GAL report, p. 6. The trial court then suspended Mother's visitation. The court did not suspend Father's visitation, but stated that visitation would be suspended if Father failed to appear for three consecutive visits. July 8, 2019 Judge's Order, p. 1-2.

{¶ 41} After Mother filed supplemental objections and MCCS replied, the trial court issued a decision overruling the objections. The court then granted permanent custody to MCCS and terminated the parental rights of both Mother and Father. May 26, 2019 Judge's Final Appealable Order, p. 11. Mother timely appealed from the judgment on June 11, 2019. However, Father did not appeal.

{¶ 42} With this background in mind, we will consider Mother's assignment of error.

III. The Award of Permanent Custody

{¶ 43} Mother's sole assignment of error states that:

MCCS Failed to Prove by Clear and Convincing Evidence That Permanent Custody Was in the Minor Children's Best Interest.

{¶ 44} Under this assignment of error, Mother raises, with respect to all three children, that MCCS failed to prove that awarding permanent custody to the agency was in the children's best interest. With regard to J.B.B., who had not been in MCCS custody for 12 or more months of a consecutive 22-month period, Mother also argues that the trial

court erred in concluding that J.B.B. could not be reunited with Mother within a reasonable period of time.

{¶ 45} The law is settled that parents have essential and basic rights to conceive and raise children. However, these fundamental rights are not absolute. *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, ¶ 39; *In re D.A.*, 113 Ohio St.3d 88, 2007-Ohio-1105, 862 N.E.2d 829, ¶ 11. In particular, "the government has broad authority to intervene to protect children from abuse and neglect." *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 28.

{¶ 46} "In a proceeding for the termination of parental rights, all the court's findings must be supported by clear and convincing evidence." *In re E.D.*, 2d Dist. Montgomery No. 26261, 2014-Ohio-4600, ¶ 7, citing R.C. 2151.414(E). (Other citation omitted.) The Supreme Court of Ohio defines "clear and convincing evidence" as " 'that measure or degree of proof which is more than a mere "preponderance of the evidence," but not to the extent of such certainty as is required "beyond a reasonable doubt" in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.' " *In re K.H.* at ¶ 42, quoting *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

{¶ 47} Decisions on terminating parental rights "will not be overturned as against the manifest weight of the evidence if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights have been established." (Citations omitted). *In re A.U.*, 2d Dist. Montgomery No. 22264, 2008-Ohio-186, ¶ 15. We review the court's judgment on this matter for abuse of discretion. *See In re C.F.* at ¶ 48 (applying an

abuse-of-discretion standard to the trial court's findings under R.C. 2151.414).

{¶ 48} As pertinent here, R.C. 2151.414(B)(1) states that:

Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:

* * *

(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *.

{¶ 49} In this case, there is no dispute that L.R.B. and N.J.B. were in MCCS's temporary custody for 12 or more months of a consecutive 22-month period, and that MCCS only needed to establish that an award of permanent custody to the agency was in the best interest of these children. *E.g., In re C.W.*, 104 Ohio St.3d 163, 2004-Ohio-6411, 818 N.E.2d 1176, ¶ 21; *In re E.S.*, 2d Dist. Clark No. 2016-CA-36, 2017-Ohio-219, ¶ 20.

{¶ 50} As indicated, J.B.B. was not in MCCS's temporary custody for the required time. In such circumstances, R.C. 2151.414(B)(2) provides that:

With respect to a motion made pursuant to division (D)(2) of section 2151.413 of the Revised Code, the court shall grant permanent custody of the child to the movant if the court determines in accordance with division

(E) of this section that the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent and determines in accordance with division (D) of this section that permanent custody is in the child's best interest.

### A. Placement with Either Parent within a Reasonable Time

{¶ 51} We will address J.B.B.'s situation first, because with respect to J.B.B., a permanent custody award depended first on a finding that he could not or should not be placed with either parent within a reasonable time. In this regard, R.C. 2151.414(E) states that:

> In determining at a hearing * * * whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence * * * that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent.

{¶ 52} After making this statement, R.C. 2151.414(E) then lists 16 factors for the court to consider. Notably, only one factor need be found for a court to make an adverse finding under R.C. 2151.414(B)(2). As a result, we will discuss only the factors the trial court found to exist, i.e., those in R.C. 2151.414(E)(1), (2), (3), (4), and (14).

### 1. R.C. 2151.414(E)(1)

**{¶ 53}** R.C. 2151.414(E)(1) states that:

Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

**{¶ 54}** The trial court concluded that this factor applied to both parents, stating that the children "were removed from Mother's care in part due to MCCS's concerns regarding Mother's significant substance abuse history. Mother has a history of significant drug use and throughout the life of this case was referred repeatedly to Addiction Services to address her substance abuse issues. Mother has not fully engaged in drug and/or alcohol treatment and was terminated from Addiction Services due to her case being closed for lack of participation. Mother also refused to comply with drug screens as requested and does not feel that her drug use is an issue. In addition, Mother failed to address her mental health issues. Finally, both Mother and Father have failed to obtain and maintain housing or income." Montgomery J.C. No. 2016-1687, Judge's Final Appealable Order ("Final Order") at p. 6.

**{¶ 55}** According to Mother, the trial court wrongfully concluded that her case plan objectives were incomplete. Mother asserts that her parenting and psychological assessment indicated she was capable of parenting her children. Mother also maintains that it stands to reason that she was capable of parenting her children because she and the children were, in fact, reunified.

**{¶ 56}** We disagree. Our review indicates that competent and credible evidence existed to support the trial court's finding under R.C. 2151.414(E)(1). The evidence was clear that Mother had failed to achieve the case plan objectives for housing and income. At the time of the permanent custody hearing, both Mother and Father were sharing a one-bedroom apartment with another person who had rented the apartment. Tr. at p. 87-88. The premises were not suitable for one child, let alone three. Furthermore, while both parents claimed to be working, no verification was ever given to MCCS. *Id.* at p. 90, 118-119, and 192. Mother suggests that MCCS could have found a way to verify her employment or income. However, this was not the duty of MCCS; Mother easily could have satisfied this minimal requirement.

**{¶ 57}** Moreover, income verification was not the only issue. While Mother was employed off and on over the course of the case, she rarely stayed long at any job. In fact, Mother was employed at four different jobs in the year before the March 2019 custody hearing, when she stated (without offering verification) that she had obtained a job at an auto parts factory. Tr. at p. 89-90, and 238. Nonetheless, even if verification had been provided, Mother had been in that job for only about a month before the hearing, and MCCS wanted Mother to establish at least a 90-day period of employment. *Id.* at p. 90. Obviously, this had not occurred. More importantly, Mother never managed to

obtain and keep steady employment during the lengthy time the case was pending.

{¶ 58} Mother also minimizes her substance abuse issues. She contends that she could re-engage in drug counseling and that a refusal to take one drug test should not be held against her. Mother's Brief, p. 14. Again, the case was filed in 2016, and the permanent custody hearing was held in March 2019. Mother had ample time to engage in drug treatment.

{¶ 59} According to the evidence, Mother tested positive for opiates at all of her children's births, except J.B.B.'s. Tr. at 172 and 254; March 16, 2016 Dependency Complaint. The initial case plan filed in May 2016 revealed that both Mother and L.R.B. had tested positive for illegally obtained prescription drugs when L.R.B. was born in February 2016. According to the plan, Mother was to complete the following assessments: parenting/psychological, drug/alcohol and mental health, and was to follow the recommendations of the assessments, which could include individual/group counseling and random drug testing. In addition, Mother was to secure employment and housing. Case Plan at p. 4. Around three years later, Mother did not have secure housing and did not have verified income. Tr. at p. 89-90.

{¶ 60} Furthermore, Mother had refused to comply with drug counseling because she did not see any benefit and did not think she had a problem. *See* Tr. at p. 105 (Mother refused a drug test in July 2018); Tr. at p. 239, 254, and 91-93 (Mother was referred to Addiction Services, did an intake in July 2018, and quit counseling in January 2019 because she did not think she had an issue and did not see the point since MCCS had filed for permanent custody); March 14, 2019 GAL Report (Mother was referred to Family Treatment Court in July 2018 and was screened in August 2018; Mother declined

to participate because she did not believe she had a substance abuse problem); Tr. at p. 112-113 (Mother tested positive for Suboxone on September 7, 2018, and had purchased the drug on the street); Tr. at p. 127-128, 183, 205; and July 25, 2018 MCCS Motion and Affidavit for Interim Temporary Custody at an Ex Parte Hearing (maternal grandparents, which whom Mother lived for most of the case, had a drug history, and maternal grandmother was arrested for drug possession and criminal tools. Maternal grandfather was also charged with petty theft and possession of criminal tools).

**{¶ 61}** As a final point, the fact that reunification was allowed did not mean that Mother had met her goals or was capable of parenting her children. At the time the court allowed reunification, Mother had not achieved the case plan goals. Reunification was conditionally granted, however, because the children, and in particular N.J.B., were showing negative effects from being shuffled between the foster parents and Mother during the process of working towards reunification. Tr. at p. 156-157. As previously indicated, Mother was required to do certain things within 30 days, and she failed to accomplish any of those items.

**{¶ 62}** Furthermore, not only did Mother fail to accomplish her goals, one of the children was found to have again been abused while in Mother's custody. There is simply no evidence that either Mother or Father remedied the conditions that caused the children's removal; to the contrary, Mother and Father both "failed continuously and repeatedly to substantially remedy the conditions causing" the children to be placed outside their home. R.C. 2151.414(E)(1).

2. R.C. 2151.414(E)(2)

{¶ 63} Although the above finding was sufficient to sustain the trial court's judgment as to J.B.B., the court also found that Mother's " '[c]hronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency * * * ' is so severe that it makes her unable to provide an adequate permanent home for the children at the present time and within one year * * * ."  Final Order at p. 6, quoting R.C. 2151.414(E)(2).  Concerning this factor, the trial court again focused on Mother's significant history of substance abuse, her failure to engage in treatment, and her failure to address mental health issues.

{¶ 64} Based on our previous discussion, we find competent, credible evidence to support the trial court's findings about Mother's history of substance abuse and failure to engage in treatment.  Concerning mental health issues, Mother was diagnosed in her youth as having bipolar disorder, attention deficit hyperactivity disorder, and obsessive compulsive disorder, and was on medication for those diagnoses.  She was not in treatment or on medication for those conditions when the children were removed in March 2016.  Tr. at p. 258; Dependency Complaint, Chris Deloia Affidavit, p. 1.  Thereafter, Mother received a mental health evaluation from Dr. Lilley, who diagnosed her with "depressed mood; opioid-related disorder by history; and R/O personality disorder with dependency and narcissistic features."  Tr. at p. 94-95; November 11, 2017 GAL Report at p. 4-5.

{¶ 65} Dr. Lilley recommended counseling focused on parenting and "parenting classes focused on children in the pre-school period and those with oppositional behaviors."  Id. at p. 5.  However, Mother did not engage in mental health treatment.  See Tr. at p. 96 and 258.  See also June 17, 2019 Motion and Affidavit to Suspend

Mother and Father's Visitation, Robert Brun Affidavit, p. 1 (noting that "[a]lmost every week [at visitation], Mother acts aggressive, yells and curses at MCCS staff. MCCS staff or visitation staff have had to call the Sheriff's deputy into the visitation on more than one occasion due to her behaviors. Mother has repeatedly threatened this caseworker to the point where this caseworker has had to file a police report against Mother. Mother also has mental health diagnoses and Mother is currently not engaged in any mental health treatment. Mother's behaviors are escalating on a weekly basis. Mother's behaviors are occurring in the presence of her children.")

{¶ 66} In addition, the GAL noted in a July 2019 report that despite Mother's mental health diagnoses and previously prescribed medication, Mother "is not on medication now, and stopped medication at 17. When [L.R.B.] was in the hospital in March 2016, mother was taken to [Miami Valley Hospital] for suicidal ideation. Mother stated she had an appointment on December 29, 2018 at the Wellness Center but forgot about it, did not attend, and did not re-schedule. Mother stated it is hard for her to even get up and function every day." July 8, 2019 GAL Report at p. 4.

{¶ 67} In light of the above discussion, competent and credible evidence existed to support the trial court's findings on the matters listed in R.C. 2151.414(E)(2).

### 3. R.C. 2151.414(E)(3)

{¶ 68} The trial court also made a finding under R.C. 2151.414(E)(3), which requires that "[t]he parent committed any abuse as described in section 2151.031 of the Revised Code against the child, caused the child to suffer any neglect as described in section 2151.03 of the Revised Code, or allowed the child to suffer any neglect as

described in section 2151.03 of the Revised Code between the date that the original complaint alleging abuse or neglect was filed and the date of the filing of the motion for permanent custody." This finding was based on L.R.B.'s admission at DHC in March 2016, the fact that her non-accidental injuries were substantiated by C.A.R.E. House, and the fact that L.R.B. again sustained non-accidental injuries while she was reunified with Mother for a brief period. Final Order at p. 7. Given our discussion of the abuse in the statement of facts, we find that competent, credible evidence supported the trial court's finding.

### 4. R.C. 2151.414(E)(4)

{¶ 69} R.C. 2151.414(E)(4) pertains to whether a "parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child." The trial court's finding on this point was based on the fact that the parents failed to address the concerns that required the children's removal. In particular, the court highlighted the parents' unwillingness to provide a permanent home. Final Order at p. 7. The court also stressed that the parents' lack of progress with the case plan revealed an unwillingness to provide for the children's basic necessities. *Id.*

{¶ 70} Based on our previous discussion, the trial court's finding on this factor was supported by competent, credible evidence.

### 5. R.C. 2151.414(E)(14)

{¶ 71} The final factor the trial court discussed is whether "[t]he parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect."   R.C. 2151.414(E)(14).   The court's finding in this regard was based on the original injuries to L.R.B., the parents' failure to verify employment and lack of independent housing, Mother's failure to address her substance abuse and mental health issues, and the physical trauma to L.R.B. after reunification. Final Order at p. 7.   For the reasons previously discussed, this finding was also supported by competent and credible evidence.

{¶ 72} Because the trial court's findings under R.C. 2151.414(E)(1), (2), (3), (4), and (14) were properly supported by the evidence, the court did not err in concluding that J.B.B. could not "be placed with one of the child's parent's within a reasonable time or should not be placed with either parent."   R.C. 2151.414(B)(2).

### B.   The Best Interest of the Children

{¶ 73} Because the first prong of R.C. 2151.414(B)(2) was satisfied to J.B.B., the remaining issue was whether awarding permanent custody of all three children was in their best interest.   Concerning a child's best interest, "R.C. 2151.414(D) directs the trial court to consider all relevant factors when determining the best interest of the child, including but not limited to: (1) the interaction and interrelationship of the child with the child's parents, relatives, foster parents and any other person who may significantly affect the child; (2) the wishes of the child; (3) the custodial history of the child, including whether the child has been in the temporary custody of one or more public children services

agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors in R.C. 2151.414(E)(7) through (11) are applicable." *In re S.J.*, 2d Dist. Montgomery No. 25550, 2013-Ohio-2935, ¶ 15. "No one element is given greater weight or heightened significance." *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, at ¶ 57, citing *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 56. To evaluate the court's decision, we will consider these statutory factors.

1. Interaction and Interrelationship of Children with Parents and Foster Parents

{¶ 74} The trial court found that this factor weighed in favor of granting permanent custody due to the children's long placement in foster care, their removal after reunification due to Mother's failure to comply with court orders, the suspension of Mother's visits due to L.R.B.'s anxious behavior in connection with visits, and the children's bonding in the foster home with each other and with the foster family. Final Order at p. 8.

{¶ 75} According to Mother, the evidence indicated that the children were bonded with her, that they had a relationship with the maternal grandparents, and that Mother visited consistently. However, the record also indicated that L.R.B. suffered physical abuse twice while living in a house with Mother and the maternal grandparents. MCCS, therefore, considered abuse substantiated with respect to the grandparents and Mother. September 5, 2018, GAL Report, p. 5-6; March 14, 2019 GAL Report, p. 5; Tr. at p. 17,

25, 31, 33, 44, 49, 150, 170-171, 172, 173, and 182.

{¶ 76} Moreover, L.R.B's visitation with Mother was stopped in September 2018 due to L.R.B.'s "emotional and hysterical behavior when she became aware it was visit day." March 14, 2019 GAL Report at p. 3. Mother and her parents also demonstrated little awareness or concern of the effect of their statements on N.J.B., when they told him shortly before the permanent custody hearing that he would be coming back to live at the residence where he had been reunited with Mother. *Id.* at p. 10. This occurred even though the grandparents had already been told that MCCS would not be pursing placement of the children with them. *Id.*

{¶ 77} We have also discussed Mother's inappropriate behaviors in front of N.J.B. and J.B.B. and her repeated comments to them about coming home, demonstrating again a lack of awareness and concern over their welfare. *See* Brun Affidavit at p. 1. Finally, there was competent, credible evidence that the children had bonded with each other and their foster family. Tr. at p. 85, 144, 145, and 147.

{¶ 78} Accordingly, we agree with the trial court that this factor weighed in favor of granting permanent custody to MCCS.

### B. The Wishes of the Children

{¶ 79} The trial court found that L.R.B. and J.B.B. were too young to express their wishes, and that N.J.B. wished to live with his parents. The court therefore found that this factor weighed in favor of granting custody to MCCS. We agree with the court. At the time of the permanent custody hearing, L.R.B. was three years old, and J.B.B. was only a year and half old. While N.J.B. was five years old and perhaps technically

capable of expressing his wishes, he was still very young, and both Mother and the grandparents had improperly attempted to influence him during visitation.

## C.   Custodial History

**{¶ 80}** Concerning this factor, the trial court found that the custodial history weighed in favor of granting custody to MCCS.   In particular, the court focused on the fact that two children had been in the temporary custody of MCCS for 12 or more months of a consecutive 22-month period and that J.B.B. was only eight months old when removed from Mother's care.   The court also noted that when all three children were again removed in July 2018, they were placed in the same foster home.   Again, we agree with the trial court, as these finding were supported in the record by competent, credible evidence.   We also note that the children have done well in their prior and current foster placements.   Tr. at p. 28, 56, 69, 73, 82, 83, 144-145, and 147.

## D.   The Need for Legally Secure Placement

**{¶ 81}** Regarding this factor, the trial court stated that considering the length of time the children had been removed from the home, they were "in desperate need of legally secure, permanent placement."   Final Order at p. 8.   The court stressed these points: the parents' failure to complete their case plan objectives; the fact that the children were in a foster-to-adopt placement and that the foster parents wanted to adopt the children; the fact that the children had spent "a significant part of their lives in foster care due to the parents' failure and/or unwillingness to meet the children's needs"; the initial abuse of L.R.B. and subsequent discovery of abuse after the children were returned; the

lack of viable options for placement with Mother's family; the fact that L.R.B. lived in the grandparents' home both times that she suffered abuse; the grandparents domestic violence and criminal involvement; and Father's statement "on several occasions that he was not in a position to care for the children." *Id.* at p. 9.

{¶ 82} Our review of the record reveals that it contained abundant competent and credible evidence to support these conclusions. The findings concerning abuse were particularly significant and troubling. Based on the evidence we have previously discussed, no reasonable possibility existed that Mother and Father would be able to provide a legally safe and secure environment for the children.

### E. Whether any Factors in R.C. 2151.414(E)(7) to (11) Apply

{¶ 83} As indicated previously, the trial court considered R.C. 2151.414(E)(1), (2), (3), (4) and (14) in considering whether J.B.B. could not be placed with one of the child's parent's within a reasonable time or should not be placed with either parent. For the reasons previously discussed, the trial court did not abuse its discretion concerning these factors. They weighed strongly in favor of granting permanent custody to MCCS.

{¶ 84} Based on the preceding discussion, we conclude that the juvenile court properly weighed the pertinent factors in R.C. 2151.414(D) and (E), and in doing so, did not abuse its discretion in finding that granting permanent custody to MCCS was in the children's best interest. Clear and convincing evidence supported this finding. Accordingly, Mother's sole assignment of error is overruled.

### III. Conclusion

{¶ 85} Mother's assignment of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

TUCKER, P.J. and DONOVAN, J., concur.

Copies sent to:

Mathias H. Heck, Jr.
Jamie J. Rizzo
Karen S. Miller
Marshall Lachman
Jeffrey Livingston
James Armstrong
Hon. Anthony Capizzi