[Cite as *In re D.L.W.*, 2024-Ohio-3032.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | |
|---|---|
| IN RE: D.L.W. | : |
| | : |
| | :    C.A. No. 30109 |
| | : |
| | :    Trial Court Case No. G-2022-000809-0J |
| | : |
| | :    (Appeal from Common Pleas Court-|
| | :    Juvenile Division) |
| | : |
| | : |

. . . . . . . . . . .

O P I N I O N

Rendered on August 9, 2024

. . . . . . . . . . .

ROBERT ALAN BRENNER, Attorney for Appellant

NATHAN B. VANDERHORST, Attorney for Appellee

. . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Appellant Mother appeals from a judgment terminating her parental rights

and granting permanent custody of her minor child to Appellee, Montgomery County

Children Services ("MCCS"). Mother contends the trial court abused its discretion in granting MCCS permanent custody when Mother simply needed more time to complete her case plan. The correct standard of review in this situation is not abuse of discretion but is whether the court's decision was against the manifest weight of the evidence or was supported by sufficient evidence. After reviewing the record, we find that the court's decision was not against the manifest weight of the evidence and was supported by sufficient evidence. Accordingly, the judgment of the trial court will be affirmed.

## I.  Facts and Course of Proceedings

{¶ 2} On February 25, 2022, MCCS filed an abuse and dependency complaint in the juvenile court regarding D.L.W., who had been born that month. In the complaint, MCCS stated that Mother had had a high-risk pregnancy and had been instructed to undergo a C-section due to the child's having growth issues. Mother did not do so, and D.L.W. was born prematurely at 33 weeks, with a low birth weight of 3 pounds, 2.4 ounces, and was in the neo-natal intensive care unit ("NICU") at Kettering Medical Center.

{¶ 3} Before filing the complaint, MCCS had received a referral on February 7, 2022, concerning physical abuse of the child. According to the referral, Mother had significant mental health diagnoses including bi-polar effective disorder, depression, and PTSD. Mother also had Hepatitis C and tardive dyskinesia. Moreover, Mother reportedly had a drug use and overdose history. Complaint (Feb. 25, 2022), p. 1-2.

{¶ 4} D.L.W. was on a feeding tube in the hospital, and the referral indicated Mother had removed the feeding tube, had given D.L.W. spoiled milk, had held D.L.W.

without supporting his head despite being instructed not to do so, and had fallen asleep while holding D.L.W. The complaint also stated that Mother had been homeless until six months earlier, when she moved into a home with her maternal grandmother and her 93-year-old great-grandmother, both of whom had medical issues. Also in the home were a maternal uncle and his wife; the wife had lost legal custody of a child who had been adjudicated dependent due to deplorable housing conditions. Mother further reported she had no income and depended on relatives to obtain baby items. In addition, Mother was not treating any of her neurological or mental health issues and admitted to having short-term memory problems. After speaking with a hospital social worker on February 17, 2022, MCCS was again told of concerns about Mother's care of the child. *Id.* at p. 2-3.

{¶ 5} Mother did not provide names of any relatives appropriate to care for the child, and on February 24, 2022, a police officer placed D.L.W. into MCCS's emergency custody at the hospital. Due to the child's fragile nature, MCCS had also been instructed to require any proposed placement, including foster parents, to undergo training and observation before the child would be released from the hospital. *Id.* at p. 3-4. MCCS therefore asked the court to adjudicate D.L.W. abused and dependent and grant temporary custody to MCCS. *Id.* at p. 4.

{¶ 6} After holding a shelter care hearing, a magistrate granted MCCS interim temporary custody and set an adjudicatory hearing for March 31, 2022. Magistrate's Interim Order (Feb. 25, 2022). The magistrate then appointed legal counsel for Mother and appointed a guardian ad litem ("GAL") for D.L.W. On March 24, 2022, MCCS filed

an initial case plan. Among the case plan objectives were that Mother: obtain and maintain stable income and housing with working utilities on an ongoing basis; maintain a safe home environment; not have drugs or drug paraphernalia in the home; establish paternity; sign releases; participate in a psychological evaluation and a parenting assessment to help in determining her ability to protect D.L.W., and follow all recommendations; attend and complete parenting education within 90 days of receiving the initial case plan; and discuss and demonstrate learned parenting skills when interacting with D.L.W.

{¶ 7} The adjudication hearing was continued because the parties could not agree about the requested adjudication. Consequently, the magistrate held that interim orders would remain in effect and that adjudication and disposition would take place on April 29, 2022. Magistrate's Interim Order (Mar. 31, 2022), p. 1. The GAL then filed a report on April 14, 2022, recommending that MCCS retain temporary custody and that efforts be made to start visitation. Subsequently, the court continued the hearing at MCCS's request due to witness unavailability. The hearing was then continued to May 9, 2022.

{¶ 8} The hearing was held as scheduled, at which time MCCS moved to delete the abuse allegations, and the parties stipulated to the facts contained in the complaint and to an adjudication of dependency under R.C. 2151.04(B), (C), and (D). Magistrate's Decision and Judge's Order (May 9, 2022), p. 1. The court therefore adjudicated D.L.W. as a dependent child, granted temporary custody to MCCS (to which Mother had agreed), and granted Mother supervised parenting time at the agency. *Id.* at p. 2-3. After a status review hearing on July 8, 2022, the court set another review hearing for October

6, 2022. At that review hearing, the court held that a supplemental GAL report should be filed and distributed no later than seven days before the previously scheduled annual review to be held on February 1, 2023.

{¶ 9} Before the scheduled review hearing, MCCS filed a motion and affidavit for permanent custody. The motion was based on the following matters: Mother failed to make significant progress on her case plan; Mother's short-term memory loss created difficulty in safe parenting; the alleged father failed to establish paternity and his whereabouts were unknown; no relatives were able or willing to care for D.L.W.; and D.L.W. had very substantial special needs due to diagnoses of "hearing loss, vision loss, feeding difficulties, gross motor delays, failure to thrive, seizures, Hepatitis C, genetic abnormalities, and retina of prematurity" and associated treatment from multiple medical providers. Motion and Affidavit for Commitment to the Permanent Custody of MCCS (Jan. 23, 2023), p. 2. The court then set a May 5, 2023 hearing on the motion.

{¶ 10} On April 20, 2023, Mother filed a motion asking the court to modify the May 9, 2022 dispositional order by extending MCCS's temporary custody. This was based on Mother's belief that she had made progress on her case plan. The court then set a May 5, 2023 hearing on that motion as well. Before the hearing, the GAL filed a report recommending that permanent custody be granted to MCCS. The GAL remarked that after being involved with the case for over a year, he found that Mother was no closer to being able to care for the child than she had been when it began. In particular, the GAL noted that "[t]he demands put on a caregiver of this child are such that it is essentially a 24 hour a day obligation. The child really cannot be left alone due to his myriad of health

issues," and "what lies ahead for this child as he develops is a significant unknown." GAL Report (Apr. 24, 2023), p. 4-5. The GAL did not have a reasonable expectation that Mother would be able to care for the child within the foreseeable future. *Id.*

{¶ 11} The hearing took place as scheduled, and the magistrate then filed a report, concluding that D.L.W. could not be placed with Mother within a reasonable period of time and that it was in D.L.W.'s best interest for permanent custody to be granted to MCCS. Magistrate's Decision and Judge's Order (May 9, 2023). Mother filed objections to the magistrate's decision on May 12, 2023, and MCCS replied. After the transcript was filed, Mother submitted supplemental objections, and MCCS did not file a reply.

{¶ 12} The trial court overruled the objections, finding that D.L.W. could not be placed with Mother within a reasonable time or should not be placed with Mother, that it was in D.L.W.'s best interest for MCCS to receive permanent custody, and that MCCS had made reasonable efforts to prevent D.L.W.'s removal, to eliminate D.L.W.'s continued removal, or to make it possible for D.L.W. to return home safely. Judge's Final Appealable Order ("Order") (Mar. 15, 2024), p. 1-8. Mother timely appealed from the court's decision. As indicated, Father was not involved in the action and he did not appeal.

## II. Grant of Permanent Custody

{¶ 13} Mother's sole assignment of error states that:

The Trial Court Abused Its Discretion When It Granted Permanent Custody of the Child to MCCS.

**{¶ 14}** Mother argues that the trial court erred in granting MCCS permanent custody because testimony at the hearing indicated that Mother should have been given more time to complete her case plan objectives. Before we consider this issue, we will outline the relevant review standards.

## A. Review Standards

**{¶ 15}** Although Mother has argued that abuse of discretion applies, this is incorrect. Instead, the standards that apply in reviewing decisions on permanent custody of children and termination of parental rights are sufficiency of the evidence and manifest weight of the evidence. *In re Z.C.,* 2023-Ohio-4703, ¶ 1. Sufficiency arguments involve testing for adequacy and questions of law. *Id.* at ¶ 13. In this situation, appellate courts should affirm a judgment where legally sufficient evidence exists to support the judgment as a matter of law. *Id.*, citing *Bryan-Wollman v. Domonko*, 2007-Ohio-4918, ¶ 3, and *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).

**{¶ 16}** " 'Although sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency in conducting the analysis; that is, a finding that a [judgment] is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency.' " *In re Adoption of L.B.R.*, 2019-Ohio-3001, ¶ 19 (2d Dist.), quoting *State v. McCrary*, 2011-Ohio-3161, ¶ 11 (10th Dist.). Consequently, " 'a determination that a [judgment] is supported by the weight of the evidence will also be dispositive of the issue of sufficiency.' " *Id.*, quoting *State v. Braxton*, 2005-Ohio-2198, ¶ 15 (10th Dist.).

**{¶ 17}** "When reviewing for manifest weight, the appellate court must weigh the

evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *Z.C.* at ¶ 14, citing *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20. "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." *Eastley* at ¶ 21. " 'The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' " *Z.C.* at ¶ 14, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). " ' "If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment." ' " *Id.*, quoting *Seasons Coal* at 80, fn. 3. (Other citation omitted.)

## B. Discussion

{¶ 18} Under R.C. 2151.414(B)(1), a court may grant permanent custody to an agency if it finds by clear and convincing evidence that this is in the child's best interest and that one of the five conditions in subsection (B)(1)(a)-(e) apply. The condition the trial court relied on here was R.C. 2151.414(B)(1)(a), which provides that a court may grant permanent custody if "the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents." Under R.C.

2151.414(E), this finding can be made if the court finds that any one of 16 listed factors applies.

**{¶ 19}** Here, the trial court found by clear and convincing evidence that R.C. 2151.414(E)(1) applied. Order at p. 3. This factor applies if: "notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home." R.C. 2151.414(E)(1) further states that in deciding if the parents "have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties."

**{¶ 20}** When the trial court considered this issue, it noted many case plan objectives that had been outlined (and to which Mother had agreed). In particular, the court focused on the following points: Mother's struggle to care for D.L.W. and his special needs; Mother's chronic short-term memory loss resulting from a prior drug overdose; D.L.W.'s very significant medical issues (including treatment by 12 specialists at Children's Hospital and multiple appointments per week); Mother's failure to attend many medical appointments, despite being informed of the visits and being given bus passes; Mother's difficulty in coping with the child during visitation; and Mother's failure, when visitation occurred at a relative's home, to comply with requirements about feeding (which

were important due to D.L.W.'s special needs).   Order at p. 3-6.

{¶ 21} Once a court makes a necessary finding under R.C. 2151.414(B)(1), "the agency still must prove by clear and convincing evidence, that it is in the child's best interest to grant permanent custody to the agency."   *In re N.M.P.*, 2020-Ohio-1458, ¶ 26, citing R.C. 2151.414(B)(1).   *See also In re L.R.B.*, 2020-Ohio-6642, ¶ 73 (2d Dist.) (discussing the child's best interest).   "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established."   *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.   " 'Where the proof required must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof.' "   *Z.C.*, 2023-Ohio-4703, at ¶ 8, quoting *State v. Schiebel*, 55 Ohio St.3d 71, 74 (1990).

{¶ 22} To decide a child's best interest, courts analyze factors set forth in R.C. 2151.414(D)(1)(a)-(e).   These include, but are not limited to: (a) the child's interaction and relationship "with the child's parents, relatives, foster parents and any other person who may significantly affect the child"; (b) the child's wishes; (c) the child's custodial history, "including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period"; (d) "the child's need for a legally secure permanent placement" and if it can be achieved without granting the agency

permanent custody; and (e) whether any factors in R.C. 2151.414(E)(7)-(11) apply. *In re S.J.,* 2013-Ohio-2935, ¶ 15 (2d Dist.). *Accord In re P.Z.A.*, 2023-Ohio-2000, ¶ 38 (2d Dist.).

**{¶ 23}** The trial court addressed all of these factors and found it was in D.L.W.'s best interest to grant permanent custody to MCCS. Order at p. 7-8. In particular, the court stressed: D.L.W.'s "very complicated medical needs that require specific attention"; Mother's failure throughout the case to consistently attend medical appointments, "which are vital to understanding how to care for the child and his medical needs"; Mother's own specific needs and reliance on other adults to help her attend her own medical appointments; and MCCS's concern over Mother's inability to keep up with the child's medical appointments and special needs given Mother's chronic short-term memory loss. *Id.* at p. 7. The court also found MCCS made reasonable efforts to prevent D.L.W.'s removal from home, to eliminate his continual removal, or to make it possible for him to return safely. *Id.* at p. 8.

**{¶ 24}** Our review of the record reveals that the court's conclusions were supported by overwhelming evidence. During the custody hearing, the court heard testimony from the MCCS caseworker, two foster mothers, and Mother. The caseworker, Julie, had been assigned to the case since April 2022 and discussed case plan objectives with Mother. In addition to the matters previously mentioned, Mother was to attend appointments for D.L.W. and was to take any medication she was prescribed. Transcript of Proceedings ("Tr.") (May 5, 2023), 69 and 71-72.

**{¶ 25}** Brittany was D.L.W.'s foster mother from February 2022 to April 2023.

When D.L.W. was 21 days old, Brittany went to the NICU to take D.L.W. home. At that time, D.L.W. was tested for Cytomergalovirus ("CMV") because he was premature, was not gaining weight, and had failed his hearing test. After D.L.W. tested positive for CMV, he was placed on an IV medication for two weeks. Once D.L.W. was discharged from the hospital, he had to be given medicine four times a day and had to have blood drawn every month to see if the viral load was dropping. D.L.W.'s kidney levels also had to be checked because the drug being used to treat CMV was a chemotherapy drug and could cause many complications. Additionally, due to low birth weight, D.L.W. had to have bottles every three hours around the clock. Until D.L.W. was eight months old, he was not cleared to be allowed to sleep longer than this three-hour period. *Id.* at 17-18.

{¶ 26} During the case, D.L.W. saw over 12 specialists and groups at Dayton Children's Hospital, including: an audiologist for hearing loss; an ENT specialist; a gastroenterologist; a feeding therapist, who would eventually transition into a speech therapist; an occupational therapist, specialists in neurology and nephrology; a developmental pediatrics team (with its own nutritionist, social worker, pediatrician, occupational therapist and physical therapist); the cerebral palsy ("CP") clinic; an ophthalmologist for vision, an ROP doctor for a retina issue; and an infectious disease specialist for treatment of CMV and Hepatitis C. *Id.* at 20-24 and 40-41.

{¶ 27} Despite the chemo treatment, CMV would always remain in D.L.W.'s blood and could cause complete blindness and hearing loss. Tr. at 23. D.L.W. had prominent hearing loss in one ear and wore a hearing aid, for which a new mold had to be created every three to four months. Putting in the hearing aid was difficult and earwax had to be

cleaned out every day. The hearing aid also had to be kept on from the time D.L,W. woke up and had to be charged every night.

{¶ 28} Due to the high-calorie formula and D.L.W.'s prematurity, his esophagus was not as strong as was needed; consequently, different medications were used for acid reflux. Three different car seats were also used because D.L.W. would asphyxiate; as a result, he could not breathe, and his airway would have to be suctioned out. *Id*, at 23-28.

{¶ 29} During the entire time that Brittany and her family had D.L.W., he was on medications; one occurred at every bottle feeding and the other occurred twice a day. Feeding therapy was initiated at six months because MCCS was looking at placing D.L.W. with a great-aunt and there was pressure for D.L.W. to start eating food even though Brittany did not think he was ready. D.L.W. was still gagging on bottles at this time and he also had to be held in a special way to be fed, which involved being tilted at an angle. *Id.* at 32-33 and 35.

{¶ 30} The feeding therapy was used to ensure that D.L.W.'s tongue was working properly. At the time, they were not yet aware that D.L.W. would be diagnosed with CP, although his MRI at birth had shown brain damage. The CP affected D.L.W.'s left side, so the left side of his tongue was very weak and numb, and food would be pushed to that side. This caused D.L.W. to choke because he was not aware food was there and that he needed to swallow. Tr. at 33-34. In addition, D.L.W. had developmental disabilities and had not reached milestones appropriate for premature babies. *Id.* at 39.

{¶ 31} At home, exercises had to be done at every diaper change, or about six

times a day. This took about two hours, and therapists would add new exercises weekly. *Id.* at 43-44. Help-Me-Grow, a service for children who are not meeting milestones, also came to Brittany's home every other week. *Id.* at 45-46.

{¶ 32} During much of D.L.W.'s short life, Brittany took him to three to seven medical appointments a week and sometimes to as many as nine appointments. By the time D.L.W. left Brittany's care in April 2023, he had three to five appointments a week. *Id.* at 47. Brittany personally invited Mother to every appointment when she saw Mother at visitation. Mother sometimes attended appointments. *Id.* at 48. Between August and October 2022, when MCCS was pursuing custody with Mother's great aunt (Mary), Mary attended medical appointments about 85% of the time, and Mother came with her 75% of that time. However, other than this particular time period, Mother attended only about one in five appointments, or about once every six weeks. *Id.* at 50-51. Brittany indicated that caring for D.L.W. was a full-time job, and that while medical visits were now shorter in duration than when D.L.W. was first born, at times "it can still be overwhelming." *Id.* at 64 and 66.

{¶ 33} During Mother's attendance at medical visits, Brittany was very concerned about D.L.W.'s safety when Mother held him. Brittany described a number of instances when D.L.W. started to slide and Mother could not hold him. This happened at every appointment Mother attended. Tr. at 52-53. During supervised visits at MCCS, Mother was also asked not to stand up while holding D.L.W. because it was scary and uncomfortable. Mother did not follow the safety plans that were made. *Id.* at 54 and 57.

{¶ 34} Brittany's family was a foster care only family, and D.L.W. was in their home

until April 4, 2023, *Id*. at 66 and 68. At that point, D.L.W. was moved because Brittany's family was being deployed. *Id*. at 70. Krystal (and her family) then assumed D.L.W.'s care on April 7, 2023. Krystal was a stay-at-home mother who had 20 years of experience in the medical field. Her home had been designated as a treatment foster home, which requires special training and means the family can take care of special needs children. *Id*. at 7-8 and 12. Krystal attended all of D.L.W.'s medical appointments after assuming his care. She saw Mother at only one appointment, which was one that Krystal attended when D.L.W. was still in Brittany's care. *Id*. at 10. Krystal testified that D.L.W. had adjusted very well to her home and was very loving, and that she was willing to adopt him if it were possible. *Id*. at 13.

{¶ 35} According to the caseworker, Julie, Mother's progress on obtaining housing and income was "minimum to none." *Id*. at 73. Mother was living with her grandmother, who had health concerns and would not be able to help care for Mother and a special needs baby. *Id*. at 74 and 95-96. While MCCS considered that the housing itself was stable, it would be difficult for the grandmother to oversee Mother's care and D.L.W.'s care. Mother's great-grandmother also lived there and was not in good health. *Id*. at 97. As a further matter, the home would not have passed a home study because an aunt and uncle who lived there had an open Children Services' case. *Id.* at 97-98.

{¶ 36} Mother also lacked income sufficient to meet D.L.W.'s needs, despite the agency's offer to assist Mother with job applications. Tr. at 74. MCCS decided to forego the psychological examination because Mother had memory loss that was never going to go away. *Id*. at 78. Specifically, Mother had been diagnosed with short-term memory

loss. She was able to remember things long-term but had no short-term memory. Mother had her own needs and relied on other adults to make sure she attended her own medical appointments. Mother had also attended very few of D.L.W.'s appointments. As a result, MCCS did not feel Mother would be able to keep up with D.L.W.'s appointments, which were crucial in preventing him from regressing. *Id.* at 93-94.

**{¶ 37}** Mother did complete parenting classes and was able to change a diaper, feed a bottle to D.L.W., and burp him for the most part. Julie did not observe that Mother learned any other skills. She stressed that Mother struggled to care for D.L.W. and his special needs. Mother could not really hold D.L.W. or soothe him; Julie often stepped in and got D.L.W. to stop crying. However, when Julie gave D.L.W. back to Mother, he would start crying again. When Julie tried to tell Mother how to sway D.L.W. back and forth to soothe him, Mother said she could not physically do that because he was too heavy and she could not hold him that long. *Id.* at 77-78. On one occasion when Julie asked if Mother wanted her to calm the baby and said she would give him right back, Mother started screaming and swearing at Julie, to the point that the police had to be called. *Id.* at 87-88. When D.L.W. was a baby, Julie also had to remind Mother quite often that she needed to support his head and neck because his neck otherwise would fall all the way back or to the side. Julie reminded Mother because Mother would forget. *Id.* at 85-86.

**{¶ 38}** As noted, while the case was pending, MCCS began a home study of Great-Aunt Mary, with whom Mother lived with for about three months. MCCS attempted two overnight visits, and D.L.W.'s foster mother, Brittany, laminated a schedule so that Mother

could mark diaper changes, bottles, and exercises. However, MCCS had to stop the visits immediately because on the first visit, Mother failed to keep track of bottles. Mother missed one or two bottles, which were critical at the time because calories were being counted and medication was in the bottles. In addition, D.L.W. went 10 hours without a diaper change. MCCS decided to try a second visit, but the same problems occurred, and MCCS had to stop home visits. Mary also said she was no longer willing to pursue custody because she had thought Mother would help. Instead, Mary was doing all the care for 24 hours a day with no assistance. *Id.* at 75-76, 83-84, and 92.

**{¶ 39}** Mother was informed of every medical appointment for D.L.W., and both the foster mother (Brittany) and Julie wrote them down for Mother. Julie also gave Mother bus passes. However, Mother lived down the street from Children's Hospital where many appointments were located and could have walked there but did not. It was necessary for Mother to come to every appointment because D.L.W.'s medical conditions were severe and any ne caring for D.L.W. had to know exactly what to do. Mother did not make significant progress on that objective. Tr. at 81-83.

**{¶ 40}** Another issue was Mother's physical capability. Mother had tremors in her hand that affected her ability to hold the baby. At the time of the permanent custody hearing, D.L.W. could not walk and might not ever be able to walk. As a result, D.L.W. was held constantly. It was also very crucial that D.L.W. be held to be soothed, but Mother held him under the arms. D.L.W. would slide down and eventually plop on the floor, and Mother just let him lay on the floor. When D.L.W. could crawl, he would crawl around on the floor. *Id.* at 88 and 104.

{¶ 41} Other than when MCCS tried to place D.L.W. with Great-Aunt Mary, Mother's visits were supervised at the agency on Wednesdays from 2:00 to 4:00 p.m. When Julie supervised visits, she observed D.L.W. slipping out of Mother's hands and landing on the floor. Julie also had to remind Mother several times during a visit to sit down and not to stand up. Further, when D.L.W. began to hold his head up, it was like a bobble-head. Even after Mother had parenting classes, Julie had to remind her often to hold up D.L.W.'s neck because Mother forgot to do so. *Id.* at 83-86 and 88. It was clear that Mother loved D.L.W., but he did not show a bond with her as he did with both foster families. *Id.* at 88-90. In fact, D.L.W. cried the majority of the time during Mother's visits. *Id.* at 86.

{¶ 42} Mother also had been placed on a time stipulation for visits, i.e., she had to come in early before visits to make sure she would show up. This began with a 15-minute stipulation, was increased to 30 minutes, and was then changed to an hour because Mother was not being consistent with visits. Tr. at 84-85. During the 13-14 month period that D.L.W. was in custody, Mother missed 13 or 14 visits at the visitation center. *Id.* at 103. Julie (and MCCS) concluded that Mother could not be reunited with D.L.W. in the foreseeable future because Mother had her own needs and relied on other adults to make sure she attended her own medical appointments. Mother also had attended very few medical appointments to understand D.L.W.'s special needs. *Id.* at 93. Julie further stated that permanent custody was in D.L.W.'s best interest because he had not missed any appointments while in foster care other than when a foster parent rescheduled one. Julie stressed it was critical that D.L.W. not miss appointments

because he could otherwise regress. *Id.*

{¶ 43} As indicated, Mother did testify at the hearing. *Id.* at 105-116. While Mother wanted the court to extend temporary custody, her testimony about why she missed visitation and failed to attend many medical appointments was unconvincing, Mother was also very vague about how she might complete objectives and showed little understanding of her child's very serious medical needs. *Id.* Finally, after hearing the testimony, the GAL reiterated that he did not "see any real likelihood in the foreseeable future that the child could be reunited with the Mother." *Id.* at 117. He also stressed that none of the individuals living in Mother's home had indicated any interest in taking the child, despite ample opportunity (nor would their circumstances work), and that permanency for D.L.W. was appropriate. *Id.* at 117-118.

{¶ 44} Given the above discussion, the decision to award custody to MCCS was not against the manifest weight of the evidence and was supported by sufficient evidence. Accordingly, Mother's sole assignment of error is overruled.

### III. Conclusion

{¶ 45} Mother's sole assignment of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . .

TUCKER, J. and HUFFMAN, J., concur.